**L & C MARINE TRANSPORT, LTD., et al., Plaintiffs-Appellees,**

v.

**Johnny WARD, Linda Ward, and Robert Freeman, Claimants-Appellants.**

No. 84–8303.

United States Court of Appeals, Eleventh Circuit.

March 22, 1985.

Rehearing and Rehearing En Banc Denied April 25, 1985.

---

J. Anderson Harp, J. Sherrod Taylor, Columbus, Ga., for Ward.

Ralph Lorberbaum, Savannah, Ga., for Freeman.

Gustave R. Dubus, Savannah, Ga., for plaintiffs-appellees.

Before JOHNSON and CLARK, Circuit Judges, and LYNNE [*], District Judge.

JOHNSON, Circuit Judge:

Appellants brought suit in the Superior Court of Chatham County, Georgia, to recover for personal injuries sustained while preparing to unload the OSWEGO PLANTER, a cargo vessel owned by appellee L & C Marine Transport Limited [1] and operated by appellee Oswego Latex Carrier Corporation. In response, the appellees instituted this action in the United States District Court for the Southern District of Georgia, petitioning for exoneration from or limitation of liability. The appellants then appeared as claimants in the federal court proceedings and sought to prove the appellees negligent. After a bench trial, the district court entered summary judgment exonerating the appellees, and this appeal ensued. We affirm.

I. FACTS

Johnny Ward and Robert Freeman were injured by a flailing steel cable while attempting to rig one of the OSWEGO PLANTER's cargo booms. Use of the boom had become necessary when the shore-based cargo equipment rented from the port authority broke down. Having performed similar operations on numerous prior occasions, Ward and Freeman were familiar with the task of rigging and oper-

---

[*] Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

[1.] Firestone Tire & Rubber Company, of which L & C Marine is a wholly-owned subsidiary, was also joined as a defendant in the superior court action and appears as an appellee in this case. The district court dismissed Firestone as a party to the litigation after finding that the appellants had failed to present sufficient evidence to pierce the corporate veil of L & C Marine. The appellants catalogue here several items of evidence purporting to show Firestone's direct control of L & C Marine. Because we hold that L & C Marine was properly exonerated from liability, the appellants' challenge to the dismissal of Firestone becomes a moot issue.

ating the cargo boom, and were authorized to use the vessel's equipment if necessary.

The accident occurred atop a platform from which the workers could operate four five-ton cargo booms, as well as a twenty-two-ton boom that had been added to the OSWEGO PLANTER in 1972. Ward and Freeman were injured when they attempted to lower one of the five-ton booms. The boom is lowered by a steel cable called the "topping lift wire." One end of the topping lift wire is attached to the free end of the cargo boom. The cable is then threaded through a pulley high on the ship's mast and connected by a clamp to a non-powered winch (called the "topping lift reel") located at the base of the mast. The boom is raised and lowered by spooling the topping lift wire on and off the topping lift reel.

The source of power for raising and lowering the boom is applied through a second steel cable (called the "bull wire"), which is connected to a powered winch that rests on the platform a few feet away from the topping lift reel. When fully rigged, the bull wire runs directly from a circular drum on the powered winch (called the "gypsy head") to the topping lift reel, separated on the reel from the topping lift wire by a circular steel divider plate. To raise the boom, the powered winch is operated so that the bull wire spools from the topping lift reel onto the gypsy head and the topping lift wire is spooled onto the reel. The boom is lowered by gravity when the powered winch is operated so that the bull wire spools from the gypsy head to the topping lift reel and the topping lift wire spools off the reel.

Cargo ships frequently enter port with their cargo equipment fully rigged and their booms in an upright, or "topped," position. In this instance, however, the OSWEGO PLANTER's chief officer had ordered the bull wire removed from the gypsy head so that the powered winch could be used in an unrelated operation. The section of the bull wire removed from the gypsy head was left loosely coiled on top of the topping lift reel. A locking bar designed to catch, when dropped, the teeth of two ratchet wheels found on either end of the topping lift reel held the cargo boom

in its topped position. Thus, when Ward and Freeman mounted the platform, their first task was to re-attach the bull wire to the gypsy head.

According to federal safety regulations, "the bull wire shall be secured to the gypsy head by shackle or other equally strong method." 29 C.F.R. § 1918.54(e)(1). Ward and Freeman did not employ a shackle, for that would have necessitated finding and attaching the end of the bull wire to the gypsy head and then operating the powered winch until all of the loose cable was wound onto the gypsy head. Rather, they chose to make several wraps around the gypsy head from somewhere in the middle of the bull wire, leaving the remainder on the floor of the platform. As the boom was being lowered, Freeman was to guide by hand the remainder of the bull wire onto the gypsy head. Ward was to operate the powered winch, and a third worker was to disengage the locking bar and hold it up.

After lowering the cargo boom a short distance, the workers stopped to check its position. The locking bar was not engaged. The boom began to shake and fall. Freeman could not hold on to the bull wire against the weight of the falling boom. He let go, and as the boom fell the topping lift wire spooled off the topping lift reel so fast that when it reached its end the clamp was snatched off. Simultaneously, the bull wire was spooled off the floor, around the gypsy head, and onto the topping lift reel with increasing speed. The flying bull wire severed Ward's feet from his body and struck Freeman in the abdomen.

The appellants propound three factual bases for liability, each of which is grounded upon the legal duty of the appellees to turn over the cargo vessel and its equipment to the longshoremen in such condition that expert and experienced workers will be able, by the exercise of reasonable care, to carry on cargo operations with reasonable safety. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 167, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981); *Marine Terminals v. Burnside Shipping Co.*, 394 U.S. 404, 416, 89 S.Ct. 1144, 1151,

22 L.Ed.2d 371 (1969). First, the appellants contend that the workspace on the platform was inadequate due to the presence of a wooden box used to store cables and accessories for the cargo booms. In particular, Ward claims that the placement of the box prevented his escape from the flailing bull wire. Second, the appellants claim the locking bar was rusted and bent, making it inoperable and resulting in its failure to stop the falling cargo boom. Third, the appellants argue that the appellees' failure to deliver the OSWEGO PLANTER to the longshoremen with its cargo gear fully rigged constituted negligence and was a substantial factor in causing their injuries.

The district court rejected these arguments and found instead that the accident resulted directly from the operational negligence of the longshoremen in failing to use a shackle to secure the bull wire to the gypsy head and in failing to engage the locking bar while checking the position of the boom. Detailed federal safety regulations require that a shackle be employed, when one is available, to connect the bull wire to the gypsy head.[2] The district court found in this case that at least one shackle was present on the platform and other shackles were available elsewhere on the ship. This finding is not challenged on appeal. Had the bull wire been shackled, concluded the district court, all of the loose cable would have been wound around the gypsy head and the powered winch would have served to brake the falling boom. Alternatively, had the locking bar been engaged when the lowering operations were halted, control of the boom would not have been lost.

## II. DISCUSSION

### A. The District Court's Findings of Fact.

The appellants challenge several of the district court's findings of fact.

These findings can be set aside on appeal only if "clearly erroneous." Fed.R.Civ.P. 52(a). A finding of fact is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see e.g., Lincoln v. Board of Regents of University System of Georgia,* 697 F.2d 928, 940 (11th Cir.1983). Here, the parties introduced evidence supporting contrary theories of what caused the appellants' injuries. The district court, in turn, made crucial evaluations of witness credibility, particularly where the expert testimony conflicted. Under these circumstances, we should be reluctant to overturn the district court's findings. *E.g., Charpentier v. Fluor Ocean Services, Inc.,* 613 F.2d 81, 85 (5th Cir. 1980). Where the evidence supports more than one conclusion and the trial court has decided to weigh it more heavily in favor of one of the litigants, "[s]uch a choice between two permissible views of the weight of the evidence is not 'clearly erroneous.'" *United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); *see e.g., Baylor v. Jefferson County Board of Education,* 733 F.2d 1527, 1532 (11th Cir.1984).

(1) Did the wooden box prevent Ward's escape?

The district court found that the wooden box was in no way related to the falling of the boom nor did it prevent Ward's escape from the flying bull wire. The court also found that the size of the available work space was sufficient for the safe operation of the cargo equipment. Seeking on appeal to convince this Court that these findings of fact were clearly erroneous, the appellants cite the testimony

---

**2.** The regulations state:

(1) Where a bull wire is taken to a gypsy head for the purpose of lowering or topping a boom, the bull wire shall be secured to the gypsy head by shackle or other equally strong method. Securing by fiber rope fastening will not be considered adequate.

(2) When, in lowering or topping a boom, it is not possible to secure the bull wire to the gypsy head, or when the topping lift [wire] itself is taken to the gypsy head, sufficient turns, in no case less than five (5), shall be used.

29 C.F.R. § 1918.54(e).

of Ward, who stated that the box did prevent his escape, and the testimony of the appellees' own expert witness, Captain Jennings, who testified that if the box had not been present Ward could have escaped.

After examining the full record, however, we are not convinced that the district court's findings are clearly erroneous. Although the box may have impeded Ward's flight in one direction, it appears that other avenues of escape were available. Indeed, Freeman dove in another direction and sustained less serious injuries. The testimony also supports the appellees' position that the accident happened too quickly for Ward to have escaped in any direction, thus rendering irrelevant the placement of the box. More importantly, for us to accept the appellants' claim that the placement of the box proximately caused their injuries would require a ruling on appeal that the appellees were under a duty to foresee this negligence and position the box accordingly. The evidence in the record more than adequately supports the district court's finding that the workers' failure to employ a shackle and engage the locking bar, not the appellees' placement of the wooden box, proximately caused the appellants' injuries. The appellants have not cited any precedent to support imposing liability on the appellees for failing to foresee the negligence of these longshoremen and mitigate their injuries.

(2) Was the locking bar in proper working condition?

■ At trial the appellants proffered testimony by, among others, the co-worker who had operated the locking bar that the bar was bent and rusted stiff before the accident occurred. The appellants' expert witness then testified that a bent and stiff locking bar was a substantial factor in causing the accident. Based on this evidence, the appellants challenge the district court's finding that the locking bar was in proper working condition prior to the accident and that the bend in the bar did not cause, but rather resulted from, the falling of the boom.

On cross examination of the co-worker, however, the appellees raised a significant question as to the reliability of his testimony by showing that he had not mentioned the bent and stiff condition of the locking bar in a statement made to OSHA representatives shortly after the accident. Moreover, a visual inspection by the ship's chief officer one day before the accident had revealed no defect in the locking bar. On the day of the accident, as the boom fell, the chief officer heard a rapid clanking noise. This is consistent with the appellees' theory that the locking bar was operative, not rusted stiff, and that it was bent as a result of repeatedly falling onto the rapidly spinning ratchet wheels. Two expert witnesses testified on behalf of the appellees that the locking bar was in proper working condition before the accident. These witnesses opined that the ratchet teeth had been mashed as a result of the locking bar hitting the ratchet wheels as the topping lift reel spun. A third expert agreed, based upon his inspection of the ratchet teeth and paint chips found on the platform floor. The district court considered all of this evidence before finding that the condition of the locking bar had not contributed to the appellants' injuries. The court expressly credited the testimony of the appellees' expert witnesses and discredited that of the appellants' expert witness. Our review of the record leaves us convinced that the district court's finding is not clearly erroneous.

(3) Was the cargo equipment negligently left unrigged?

The appellants base this claim on an alleged custom among cargo vessels to enter port with their booms fully rigged. Had the equipment been rigged, Ward and Freeman would not have had to work with the loose bull wire. Thus, the appellants argue that the unrigged condition of the cargo boom breached the appellees' duty to deliver a reasonably safe vessel to the longshoremen who were to unload it. *Scindia, supra,* 451 U.S. at 167, 101 S.Ct. at 1622.

■ In response, the appellees cite testimony by Ward and Freeman that they had often rigged cargo booms without using shackles. This admission of their expe-

rience in rigging cargo booms completely undermines the appellants' argument that a custom in fact existed and that delivering the OSWEGO PLANTER to the longshoremen with the boom not rigged constituted negligence. Moreover, not every breach of custom will serve as a predicate for liability. Custom is not dispositive in negligence actions. *See Texas and Pacific Railway Co. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903) ("What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.").

**B. The Admission of the Safety Report as Evidence.**

At trial the appellees introduced as evidence a certificate prepared by the American Bureau of Shipping ("ABS") after an inspection of the OSWEGO PLANTER only four days before the accident occurred. Despite several relevant discovery requests, the appellants did not learn of this certificate until nine months after the court-imposed deadline for completing discovery had expired, just twenty-eight days before the trial began. The district court denied the appellants' motions to exclude the introduction of the ABS certificate and, in the alternative, to reopen discovery for the limited purpose of exploring the basis for the vessel's certification. The appellants now claim that the court abused its discretion in denying these motions.

A district court's ruling to admit or exclude evidence because of one party's failure to comply with the limits imposed on discovery is not to be disturbed absent a clear abuse of discretion. *E.g., Port Terminal & Warehousing Co. v. John S. James Co.*, 695 F.2d 1328, 1335 (11th Cir. 1983). There is no question that the appellees here failed to comply with the rules of discovery and deliver the inspection certificate when requested. However, the ABS certificate simply comprises cumulative evidence of the cargo equipment's proper working condition. The ship's chief officer had inspected the cargo gear on the day before the accident. Only two months before, the equipment had been inspected and certified safe by the International Cargo Gear Bureau. Several expert witnesses testified at trial that the cargo gear was in proper working condition before the accident. Therefore, we hold that the district court's admission of the ABS certificate, if improper, was nevertheless harmless. *E.g., Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 307 (5th Cir.1978). Similarly, the court's refusal to reopen discovery, if an abuse of discretion, was harmless. We can find no indication in the record that the appellants would have altered their trial preparation or the presentation of their case had further discovery been permitted.

AFFIRMED.